**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARL S. CHAMBERS,** | : | |
| **Petitioner** | : | **CIVIL ACTION NO. 3:06-0980** |
| **v.** | : | **(NEALON, D.J.)** |
| | | **(MANNION, M.J.)** |
| **JEFFREY BEARD &** | : | |
| **WARDEN LOUIS FOLINO,** | : | |
| **Respondents** | | |

<u>**MEMORANDUM AND ORDER**</u>

Before the court is the petitioner's motion for discovery and access to physical evidence for testing. (Doc. No. 12.) For the following reasons, the court grants the motion.

I. **Procedural Background**[1]

On June 26, 1987, the petitioner was convicted in the York County Court of Common Pleas of first-degree murder and robbery. He was sentenced to death. The Court of Common Pleas denied post-verdict motions. On direct appeal, the Pennsylvania Supreme Court affirmed the conviction but vacated the sentence because of the prosecutor's improper statement during the penalty phase. The court remanded the case for resentencing, at which time the petitioner was again sentenced to death. The court upheld the second death sentence, and the U.S. Supreme Court denied certiorari on

---

[1]The parties agree on the procedural history to the case, and the court takes it from their submissions. (Doc. Nos. 12 at 1-3 & 28 at 1-3.)

October 6, 1997.

On April 21, 1998, the petitioner petitioned for relief under the Post-Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. § 9541 *et seq.* The Court of Common Pleas denied the petition.  Once again, the state Supreme Court affirmed the lower court's decision concerning the trial's guilt phase, but reversed and remanded for resentencing because the trial court had improperly instructed the jury.

Prior to the petitioner's third sentencing, the U.S. Supreme Court handed down its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), prohibiting the execution of the mentally retarded.  The trial court found the petitioner to be mentally retarded and ineligible for capital punishment. It then sentenced the petitioner to life imprisonment on June 23, 2005.

On May 15, 2006, the petitioner, proceeding *pro se* and *in forma pauperis*, filed the petition for writ of habeas corpus under 28 U.S.C. § 2254 that gives rise to the instant motion.  (Doc. No. 1.)  On May 24, 2006, the court appointed the Federal Public Defender as counsel for the petitioner. (Doc. No. 5.)  On June 24, 2006, the petitioner, through counsel, submitted an amended petition.  (Doc. No. 10.)  On September 25, 2006, the petitioner filed the instant motion for discovery, with a brief in support.  (Doc. Nos. 12 & 13.)

On September 26, 2006, the court ordered the respondents to show cause why the petition should not be granted.  (Doc. No. 14.)  The

2

respondents, through the York County District Attorney, responded on December 29, 2006.  (Doc. No. 22.)

The petitioner traversed the response on January 11, 2007.  (Doc. No. 23.)

On June 6, 2007, the court discovered that the respondents had not responded to the petitioner's motion for discovery and ordered them to do so. (Doc. No. 25.)  On July 24, 2007, the respondents submitted a brief in opposition to the motion.  (Doc. No. 28.)  On August 2, 2006, the petitioner submitted a reply brief.  (Doc. No. 29.)

The motion having been fully briefed, it is ripe for disposition.  The court has jurisdiction pursuant to § 2254.

## II.    Factual Background

The court takes the description of the crime for which the petitioner was convicted from the Pennsylvania Supreme Court's decision affirming the conviction:

> Our review of the record reveals that the Commonwealth established the following facts.  On Saturday, February 1, 1986, at or near 3:30 p.m., the victim, Anna Mae Morris, entered the C & M Variety store (hereinafter the "Fish Store") to purchase groceries with proceeds from her Social Security check which she had cashed the preceding day. The clerk filled her order and tallied her purchases. The victim then reached under her shirt for her wallet, tendered the amount due, put the change in her wallet, replaced her wallet under her shirt and left the store. At the same time, Appellant and a group of his friends were playing pinball and eating fish sandwiches in plain view of the victim. They had recently come from the home of Adam McKinney, a member of

3

this group, where they had smoked some marijuana and drank some alcoholic beverages. These friends testified that Appellant neglected to place money into the common fund they collected for food purchases that day at the fish store and that moments after the victim departed, Appellant told his friends that he had something to do, adding he would meet them later in the evening at Adam McKinney's house. Appellant quickly left the fish store.

No one saw the Appellant, or the victim, until approximately 4:15 p.m. or 4:30 p.m. when Edgar Coder and Travis Wolfe stated that they saw the Appellant and the victim on the Silver Bridge (so named because of its color). They were the last people to see the victim alive.

These witnesses testified that, although they could not hear what the Appellant and the victim were saying to each other, they appeared to be arguing. In addition, Edgar Coder testified that the Appellant had what appeared to be a large stick in one of his hands. Sometime between 4:45 p.m. and 5:00 p.m., another witness, Kevin Hartmen, while walking his dog there, noticed a body under the Maryland-Pennsylvania Railroad Bridge (hereinafter the "Black Bridge" so named because of its painted color). (The Black Bridge is in close proximity to the Silver Bridge and both of these structures span the Codorus Creek.) Kevin Hartmen immediately contacted his friend, Donald Snell, who also saw the body. Mr. Snell approached his father about what he had seen. His father then told a retired policeman. In turn, the retired policeman contacted the York Police Department and reported the body beneath the Black Bridge.

The police arrived at the scene at 8:35 p.m. and began their investigation. The police found the victim's numerous articles of clothing, her torn open, empty wallet, along with her upper and lower dentures strewn around her lifeless, nude body. The autopsy revealed the victim was beaten to death by a blunt instrument and the cause of death was later determined to be a subdural hemorrhage or brain hemorrhage (R., p. 590).

While the police were investigating the murder scene, Appellant, armed with an axe handle, went to a local bar called the Shady Dell. Before he was permitted to enter the bar, the manager, John Ettline, ordered Appellant to leave this club outside because Mr. Ettline did not want patrons carrying weapons into his establishment. Appellant complied and

4

meandered through the Shady Dell for a time and left without re-claiming his stick. From there he proceeded to Adam McKinney's home.  When he arrived at Adam's home, Appellant now possessed alcohol, marijuana, and money.  Appellant did not tell his friends where he had been, what he had done, or where he obtained the money to make his purchases, whereas a few hours before he did not have funds to contribute to their kitty.

Over the next few months the police engaged in an exhaustive investigation.  The questioning of witnesses revealed that the Appellant often carried an axe handle, that he told his friends the police considered him a prime suspect, and that the police stopped Appellant as he was attempting to leave town. Debra Phillips, a woman who knew the Appellant, told the police she gave the axe handle to him because of a foot injury he received in an altercation with Debra's nephew some time before the murder.  At that time, she suspected he could use the handle as a cane.  Intense questioning of the Appellant's acquaintances confirmed that on the day of the murder the Appellant was seen carrying this axe handle.  Their testimony also revealed that when he entered the fish store on the day of the murder, he had the axe handle with him but the owners requested he leave it outside. When Appellant's friends left the fish store after the Appellant had departed, they noticed that the stick was gone.  And finally, they noted that the Appellant did not have "his stick" when he rejoined them later in the evening at Adam's house.

On December 9, 1986, while Appellant was in the York County Prison on charges unrelated to this incident, he confided in two fellow prisoners, Jeffrey Hutchenson and Richard Taylor, and told them that he had killed the victim. Appellant said, "that when he asked the victim for her money and she refused, he hit her and took the money."  The next day Jeffrey Hutchenson contacted his attorney, who notified the police.  An arrest warrant was then issued on December 12, 1986, for the Appellant.

*Commonwealth v. Chambers*, 599 A.2d 630, 633-35 (Pa. 1991).  As the state

Supreme Court recognized, the Commonwealth's case against the petitioner

was based entirely on circumstantial evidence.  *Id.* at 635 (acknowledging that

"there were no eyewitnesses to the robbery or the murder" and "all of the

evidence was circumstantial").

The respondents summarize the Commonwealth's forensic case at trial as follows:

> [T]he Commonwealth presented the testimony of chemist Janice A. Roadcap, of the Pennsylvania State Police Crime Laboratory. Roadcap testified as to the various pieces of evidence submitted to the Pennsylvania Police Crime Laboratory in connection with Petitioner's case including six items containing blood, and numerous hairs recovered from the crime scene. All blood evidence, except for one piece determined to be of insufficient quantity for testing, was determined to be of Type O blood. All hair samples found at the scene, with the exception of one, were determined to be either consistent with the victim's hair or of non-human origin. The hair sample found to be inconsistent to that of the victim was never compared to any sample of Petitioner's hair, and the blood samples were never compared to that of the Petitioner.

(Doc. No. 22 at 7 (internal citations to record omitted).)

The petitioner recognizes that none of the "blood and hair evidence at the crime scene . . . was in anyway connected to Petitioner." (Doc. No. 10 at 7-8.) Likewise, the State Police Crime Laboratory found no genetic material belonging to the victim on the ax handle. (Doc. No. 10 at 8.)

## III.  Discussion

### A.  The parties' arguments

In his petition, the petitioner contends that he is actually innocent of murder. He contends that court error and ineffective assistance of counsel precluded him from obtaining scientific testing of evidence that, if properly tested, would cast doubt on the petitioner's guilt. (Doc. Nos. 10 at 18-26 & 12

6

at 3.)   Acknowledging that no forensic evidence was used to obtain the petitioner's conviction, he claims that he was wrongly convicted based on "weak, contradictory" circumstantial evidence by untrustworthy witnesses. (Doc. No. 10 at 7.)

In support of this claim, the petitioner has submitted an affidavit from Albert Harper, Ph.D., the director of the Henry C. Lee Institute of Forensic Science at the University of New Haven.  (Doc. No. 11.)  He states that he is "a forensic scientist and have been qualified as an expert in forensic science in Main, Connecticut, New York, Florida and Pennsylvania."  (Doc. No. 11 at ¶ 1.)  His "conclusions in this affidavit are to a reasonable degree of scientific certainty."  (Doc. No. 11 at ¶ 1.)

Dr. Harper reviewed the record as pertinent to the petitioner's claim, including

> the direct appeal opinion; relevant transcripts from the trial, (including the testimony of the forensic pathologist, the state police laboratory criminalist and other state and local police witnesses who processed the crime scene), the autopsy report; state police laboratory reports, including the results of testing conducted on various items obtained either at the crime scene or in the course of the investigation; some, but obviously not all of the crime-scene photographs; and, some, but not all, diagrams of the crime scene.

(Doc. No. 11 at ¶ 2.)  Based on his review, Dr. Harper had "serious concerns about the forensic evidence available and presented at trial."  (Doc. No. 11 at ¶ 3.)

First, Dr. Harper states that the victim's autopsy report shows an

indicator of sexual activity, but there is no record of whether a vaginal swab was taken to test for fluids issuing from someone other than the victim. "A proper and complete forensic investigation should have included the taking of a" vaginal swab. (Doc. No. 11 at ¶ 3.) If a vaginal swap exists and if its condition is suitable for testing, a DNA test could determine the presence of foreign DNA in the victim's vagina. (Doc. No. 11 at ¶ 3.)

Second, "a proper and complete forensic investigation should also have included taking oral swabs from the decedent." (Doc. No. 11 at ¶ 4.) But Dr. Harper found no indication in the record of whether oral swabs were collected. As with the vaginal swab, if it exists and is testable, it could indicate the presence of foreign DNA. (Doc. No. 11 at ¶ 4.)

Third, three hairs were collected from the victim's hands. They were tested by the comparison method used at the time of the petitioner's trial. But Dr. Harper has "no confidence that the hair comparison testing utilized during that time meets the professional standards for reliability primarily because those methods were much more subjective than the more reliable mitochondrial DNA testing that is presently available and generally accepted in the scientific community." (Doc. No. 11 at ¶ 5.)

Fourth, other hairs were collected at the murder site, including hairs identified as dog hairs. As with the hairs found on the victim, modern DNA testing would be "much more reliable" than the comparison testing used at the time of trial. (Doc. No. 11 at ¶ 6.)

8

Fifth, fingernail clippings were collected from the victim.  Modern testing methods would likely result in more reliable result than the methods used at trial.  (Doc. No. 11 at ¶ 7.)

Sixth, Dr. Harper found no indication in the record that the ax handle or a stick were subjected to alternative light source ("ALS") testing to determine the presence of fluids or other materials not observable by the naked eye. ALS testing would reveal whether there is biological material, which could then be DNA tested.  (Doc. No. 11 at ¶ 8.)

Seventh, testimony at trial revealed that a drop of blood was found on the stick.  At the time of trial, the drop was too small to test.  Presently, however, the drop could be tested by modern methods.  (Doc. No. 11 at ¶ 9.)

Finally, Dr. Harper found no indication that clothing found at the murder scene was subjected to ALS testing.  ALS testing would reveal the presence of fluids, which could then be subjected to DNA testing.  (Doc. No. 11 at ¶ 10.)

On the basis of Dr. Harper's affidavit, the petitioner has identified items that he would like access to.  First, he notes that Dr. Harper did not have access to the complete investigative record, "including all the crime photographs, charts and diagrams."  (Doc. No. 12 at ¶ 6.)  Consequently, "[i]n light of the conclusions of Dr. Harper calling into question the reliability of the forensic testimony presented at Petitioner's trial," he seeks access to the full investigative record.  (Doc. No. 12 at ¶ 6.)  He also seeks access to the items identified by Dr. Harper that could be subjected to DNA testing: any vaginal

9

and oral swabs from the victim; the hairs taken from the victim's hands;  the hairs found at the crime scene; and, the victim's fingernail clippings.  (Doc. No. 12 at ¶ 7.)  Finally, he seeks access to the items identified by Dr. Harper that could be subjected to ALS testing: the ax handle; the stick; and, the victim's clothing.  (Doc. No. 12 at ¶ 9.)  For each request, the petitioner argues that he has shown good cause as to allow discovery in accordance with Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.  (Doc. No. 13 at 2-4.)

The respondents contest the motion.   First, they contend that the petitioner is not entitled to discovery because he failed to exhaust state remedies by seeking discovery in state court pursuant to 42 Pa. Cons. Stat. Ann. § 9543.1.  Second, they contend that the petitioner has not shown good cause as to warrant discovery.  According to them, the petitioner is engaged in a fishing expedition backed by bald assertions and conclusory statements. At trial, the petitioner cross-examined the Commonwealth's forensic expert and elicited an admission that the prosecution could not "connect the blood at the crime scene with the victim or the petitioner as the samples available at the crime scene did not contain enough biological material to even determine whether the blood was animal or human."  (Doc. No. 28 at 6.)  In addition, the petitioner raised to the jury the lack of forensic evidence tying him to the crime.  (Doc. No. 28 at 6-7.)

In reply, the petitioner disputes the respondents' arguments.  First, he

10

argues there is no exhaustion requirement for habeas discovery.  Second, he reiterates that he has shown good cause.  The respondents "miss the point entirely" by arguing that the petitioner already had the opportunity to contest the forensic evidence at trial, showing that there was no forensic evidence linking the petitioner to the crime.  (Doc. No. 29 at 7.)  Rather, the petitioner was unable to obtain affirmative evidence to cast doubt on his guilt by showing that another's genetic material was recovered and that the purported murder weapon, the ax handle, has no genetic material.  (Doc. No. 29 at 7-8.)

## B.    Exhaustion

The court finds that exhaustion of state remedies is not a prerequisite to the motion for discovery in this case.  It further finds that the petitioner has, in any event, exhausted remedies as relevant to his motion for discovery.

A district court may grant a petition only if the petitioner has exhausted all available state remedies as to each federal claim raised in the petition.  28 U.S.C. § 2254(b)(1)(A)[2]; Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir. 2004).  First, the court finds that the plain language of § 2254(b)(1)(A) speaks to the petition itself and not a motion filed subsidiarily to it.  The provision prohibits a court from granting

---

[2]The provision provides: "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State."

11

a petition only and nothing more.  It would be an improper reading of the language to stretch it to include all motions filed in a habeas case.[3]  Second, and relatedly, the language of Rule 6, unlike the language of § 2254, imposes no limit on the granting of discovery other than a finding of "good cause."  It would be improper for the court to impose a restriction that the U.S. Supreme Court and Congress did not include.  *See Steward v. Grace*, 362 F.Supp.2d 608, 622 n.40 (E.D. Pa. 2005) (finding that court must evaluate motion for discovery under Rule 6 and not § 9543.1); *Abdul-Salaam v. Beard*, Civ. No. 02-2124, at 10-11 (M.D. Pa. 2005) (slip op.) (holding that exhaustion under § 9543.1 is not required to seek discovery under Rule 6); *but see Calderon v. U.S. Dist. Ct. for the N. Dist. of California*, 98 F.3d 1102, 1106 (9th Cir. 1996) ("[A]ny right to federal discovery presupposes the presentation of an unexhausted federal claim, because a federal habeas petitioner is required to exhaust available state remedies as to each of the grounds raised in the petition.").

In his petition, the petitioner states that he exhausted remedies with respect to his claim that court error and ineffectiveness of counsel precluded forensic testing of blood and hair evidence from the crime scene.  (Doc. No.

---

[3]The court's understanding of the exhaustion requirement is bolstered by § 2254(b)(2), which provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  The provision clearly provides an exception to § 2254(b)(1)(A) and just as clearly refers to addressing a petition itself on its merits, not a subsidiary motion.

10 at 18 n.13.)  The respondents agree.  (Doc. No. 22 at 6.)  Both parties cite to the Pennsylvania Supreme Court's opinion in the petitioner's PCRA petition, *Commonwealth v. Chambers*, 807 A.2d 872, 889 (2002).  In that case, the court treated not only the petitioner's claim concerning court error and ineffectiveness of counsel, but also a challenge by the petitioner to the lower court's denial of a motion for discovery for forensic testing of the items.

### C.    Discovery

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Thus, a petitioner has no recourse to the typically broad discovery afforded parties in a civil action; instead, the courts must determine the necessity of habeas discovery "as law and justice require." *Id.* (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).  The Rules Governing § 2254 Cases reflect the limited availability of discovery.  Rule 6(a) provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  A petitioner has shown good cause "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09 (quoting *Harris*, 394 U.S. at 300).  In such a case, "it is the duty of the court to provide the necessary facilities and procedures for an

13

adequate inquiry." *Id.* (quoting *Harris*, 394 U.S. at 300).

A petitioner must make a specific request for discovery and must provide reasons for that specific request.  Rule 6(b) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254; *In re Horn*, 185 Fed.Appx. 199, 204 (3d Cir. 2006) (not precedential).  He may not "go on a fishing expedition through the government's files in hopes of finding some damaging evidence." *Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir. 1994) (quoting *Munoz v. Keane*, 777 F.Supp. 282, 287 (S.D.N.Y.1991)); *accord*, *Calderon*, 98 F.3d at 1106 ("[C]ourts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation.") (citing *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994)).

The court finds that the petitioner has shown good cause as to warrant the discovery of the physical evidence for forensic testing sought in his motion. The parties, as well as the Pennsylvania Supreme Court, make clear that the petitioner's conviction was secured by circumstantial evidence, primarily the testimony of witnesses giving the petitioner motive and opportunity to commit the crime and two inmates to whom the petitioner confessed.

If the results of the tests sought by the petitioner were to match the petitioner's theory, it is arguable that those results could undermine the Commonwealth's theory on which the petitioner's conviction was secured. Of course, the court cannot know the weight the jury attributed to each

14

component of the circumstantial case, but there can be no doubt that in a case that consisted entirely of circumstantial evidence, the discovery that any part of that circumstantial evidence does not support the case can undermine confidence in the conviction.  A conviction based entirely on circumstantial evidence, while irrefutably legitimate, is *per se* weaker than a conviction based on direct evidence.  Indeed, to use a cliché, a totally circumstantial case may be likened to a house of cards because it is generally the totality of the circumstantial evidence that led to the conviction rather than any particular piece of evidence, and if enough of those cards are removed, the house can no longer stand.  Thus, if the forensic testing were to produce the results anticipated by the petitioner, the propriety of the conviction could be undermined.

For instance, the victim was found naked, with her dentures out of her mouth.  These may well be indicia of sexual activity.  Certainly, it is striking that a woman would be stripped, even to the extent of removing dentures, for mere robbery.  In addition, the autopsy report showed a chemical indicator of sexual activity.  Yet, it appears no oral or vaginal swabs were collected, or if collected, were not tested.  If the swabs exist and are testable, they could provide a significant clue as to the identity of the perpetrator.  Similarly, the victim's clothing and fingernail clippings, as well as the hairs found in her hands and around her body, could provide important genetic evidence.

Most important, as the court sees it, would be the forensic testing of the

15

ax handle. The ax handle is definitely linked to the petitioner, and the Commonwealth clearly identified the ax handle as the potential murder weapon.  But it does not appear that the handle was subjected to reliable testing to indicate the presence of biological matter.  The discussion of the case by the state Supreme Court and the respondents does not indicate that the Commonwealth proffered biological matter taken from the handle as a means of showing that the petitioner used it to murder the victim.  As with the rest of the case, it was circumstantial: the petitioner was known to use the handle as a cane, and the victim was bludgeoned to death by something like the handle.  A stick, too, was identified as the potential murder weapon and was linked to the petitioner by an eyewitness.  It supposedly has a drop of blood that, at the time of trial, was too small to be tested, but could now be tested.  The testing of two items identified as potential murder weapons is crucial for the petitioner.  Both have been linked to his possession and are consistent with the manner in which the victim was murdered.  But there is no forensic evidence directly linking the handle or the stick to the murder.  If either item lacks biological matter, it may be relevant to the likelihood that it is the murder weapon.  If both items lack biological matter, it would certainly strengthen the petitioner's claims.  Now that reliable forensic testing is available, the court sees no reason to deny the petitioner testing of two important pieces of circumstantial evidence.

Even were the forensic testing to reveal the results predicted by the

16

petitioner, there would remain significant circumstantial evidence implicating the petitioner.  Several eyewitnesses gave the petitioner motive and opportunity to commit the brutal crime.  Two inmates testified that the petitioner confessed to them.  As noted above, the court has no idea how the jury weighed the testimony of the eyewitnesses or inmates compared to evidence such as the ax handle.  But such evidence must certainly have informed the jury's conclusions.  And the court must wonder whether or not the jury could credit eyewitnesses, whom the petitioner argues are suspect because of their lifestyles, and convict if the forensic evidence contradicted or, at least, did not support their testimony.

None of this is to say that the court finds, at this time, merit to the claims in the petition.  The petition is not yet before the court, and the court must, therefore, reserve judgment pending a thorough review of the legal issues raised by the petition.  But for the purposes of the motion, the court finds that the petitioner has shown good cause by specifically alleging that the absence of his genetic material from specific items of evidence belonging to the victim and used in her murder could call into question his involvement in the crime.

The court notes, too, that the respondents have not rebutted Dr. Harper's affidavit by suggesting that the Commonwealth's forensic examination was sufficient or that Dr. Harper's suggested testing would somehow be meritless.  They simply argue that the petitioner is not entitled to discovery.  The petitioner's brief, bolstered by the uncontroverted expert

17

opinion of a forensic scientist, has convinced the court otherwise.

Finally, the court wants to stress that this order is limited solely to the particular circumstances presented by the petitioner in the instant motion. That the court has found good cause to allow discovery here does not, in any way, mean that the court will find good cause in later motions filed by the petitioner or in other cases challenging convictions obtained by circumstantial evidence. Rather, consistent with the court's duty to treat each case individually, it will only grant discovery after determining whether the petitioner in each case has shown good cause.  No flood gates will be opened by this decision.  *Cf. Abdul-Salaam*, Civ. No. 02-2124, at 7 ("[A]s in all habeas cases, we will, as we must, evaluate each discovery request in accordance with the Habeas Corpus Rules and the prevailing case law.  Respondents should be assured that our ruling is not intended to open a discovery floodgate, and that any future discovery requests will be handled in the same deliberate manner that the Court has utilized in resolving this Motion.").

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

(1).    the petitioner's motion for discovery and access to physical evidence for testing is **GRANTED**;

(2).    the petitioner shall submit within twenty (20) days of this order a list of items he seeks to discover, specifically identifying each item and limited to the items identified in the motion and any supporting materials, including Dr. Harper's affidavit;

(3).    the respondents shall reply within ten (10) days of the receipt of the list by notifying the petitioner as to the existence and condition of any items sought by him; and,

(4).    both parties shall submit to the court within an additional fifteen (15) days a proposed scheduling order providing a reasonable length of time for the petitioner to forensically test the discovered items, for the petitioner to submit a supplemental petition on the basis of the testing, for the respondents to submit a supplemental response to the supplemental petition, and for the petitioner to submit a supplemental traverse to the supplemental response.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**


Date: August 9, 2007
O:\shared\ORDERS\2006 ORDERS\06-0980.07.wpd