**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARL S. CHAMBERS,** | : | |
| **Petitioner,** | : | **CIVIL ACTION NO. 3:06-0980** |
| **v.** | : | **(NEALON, D.J.)** |
| | | **(MANNION, M.J.)** |
| **JEFFREY BEARD** *et al.*, | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

Before the Court is petitioner Karl S. Chambers' Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. (Doc. No. 1.)  The Petition has been fully briefed.[1] For the following reasons, the Court recommends that the Petition be denied.

## I.    PROCEDURAL BACKGROUND[2]

---

[1] *See* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, (Doc. No. 1); Petitioner's Consolidated Brief in Support of, and Supplemental and Amended Petition for a Writ of Habeas Corpus by a Prisoner in State Custody Pursuant to 28 U.S.C. [§] 2254, (Doc. No. 10); Respondents' Response to Petition Under 28 U.S.C. § 2254, (Doc. No. 22); Petitioner's Reply to Respondent's [sic] Response to Petitioner's Petition for a Writ of Habeas Corpus by a Prisoner in State Custody Pursuant to 28 U.S.C. [§] 2254, (Doc. No. 23).

[2] The parties do not dispute the procedural history to the case, and the Court takes the procedural history from their submissions, the exhibits attached thereto, and from the cases cited therein. *See supra* note 1 (citing the parties' submissions). The statement of procedural background is largely drawn from the Court's August 9, 2007 Memorandum and Order. (Doc. No. 30.)

On June 26, 1987, the petitioner was convicted by a jury in the York County Court of Common Pleas of first-degree murder and robbery. (Doc. No. 40 at 6; *but see* Doc. No. 22 at 4 (respondents' brief reporting a 1988 conviction); Petitioner's *Chambers-2* Brief at 5 (reporting a 1989 conviction)). Afterwards, he was sentenced to death. The Court of Common Pleas denied post-verdict motions. On direct appeal, the Pennsylvania Supreme Court affirmed the conviction, but vacated the death sentence because of an improper statement by the prosecutor during the penalty phase. The Pennsylvania Supreme Court remanded the case for resentencing. *See Commonwealth v. Chambers*, 599 A.2d 630 (Pa. 1991) (hereinafter "Chambers-1").

At resentencing before the York County Court, the petitioner was again sentenced to death by a jury. On direct appeal, the Pennsylvania Supreme Court upheld the second death sentence. *See Commonwealth v. Chambers*, 685 A.2d 96 (Pa. 1996), *cert. denied*, 522 U.S. 827 (1997) (hereinafter "Chambers-2").

On April 21, 1998, the petitioner filed an amended brief for relief under the Post-Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. § 9541 *et seq.* The Court of Common Pleas denied the petition. Once again, the Pennsylvania Supreme Court affirmed the lower court's decision concerning the trial's guilt phase, but reversed and remanded for resentencing because the trial court had improperly instructed the jury. *See Commonwealth v.*

2

*Chambers*, 807 A.2d 872 (Pa. 2002) (hereinafter "Chambers-3" and collectively with collateral review before the trial court, the "PCRA Proceedings").

Prior to the petitioner's third sentencing, the Supreme Court of the United States handed down its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) (Stevens, J.), prohibiting the execution of the mentally retarded. The trial court found the petitioner to be mentally retarded and ineligible for capital punishment.  It then sentenced the petitioner to life imprisonment on June 23, 2005.

On May 15, 2006, the petitioner, proceeding *pro se* and *in forma pauperis*, filed the petition for writ of habeas corpus under 28 U.S.C. § 2254 that gives rise to the instant motion. (Doc. No. 1.) On May 24, 2006, the Court appointed the Federal Public Defender as counsel for the petitioner.[3]  (Doc. No. 5.) On July 24, 2006, the petitioner, through counsel, submitted an amended petition and brief. (Doc. No. 10)  (hereinafter and collectively with Doc. No. 1, the "Petitioner's Opening Brief"). Petitioner asserted five grounds for relief, or in lieu thereof, requested an evidentiary hearing. *See* Petitioner's Opening Brief at I, 5-7. The respondents, through the York County District

---

[3] Petitioner's counsel at the trial court level and on appeal in the *Chambers-1* and *Chambers-2* proceedings was Thomas L. Kearney, III, Esq. Petitioner's counsel at the trial court level and on appeal in *Chambers-3* proceedings was Ellen Berkowitz, Esq. *See Chambers-3*, 807 A.2d at 879 nn.7, 8. Anne L. Saunders, Assistant Federal Public Defender, appears on the brief for petitioner in the instant habeas proceedings.

Attorney, responded on December 29, 2006. (Doc. No. 22) (hereinafter the

"Responsive Brief"). The petitioner replied on January 11, 2007. (Doc. No. 23)

(hereinafter the "Reply Brief").

The matter having been fully briefed is ripe for disposition. The Court

has jurisdiction pursuant to title 28 U.S.C. § 2254.


## II.    FACTUAL BACKGROUND

The Court takes the description of the crime for which the petitioner was

convicted from the Pennsylvania Supreme Court's decision affirming the

conviction:

> Our review of the record reveals that the Commonwealth established the following facts. On Saturday, February 1, 1986, at or near 3:30 p.m., the victim, Anna Mae Morris, entered the C & M Variety store (hereinafter the "Fish Store") to purchase groceries with proceeds from her Social Security check which she had cashed the preceding day. The clerk filled her order and tallied her purchases. The victim then reached under her shirt for her wallet, tendered the amount due, put the change in her wallet, replaced her wallet under her shirt and left the store. At the same time, Appellant and a group of his friends were playing pinball and eating fish sandwiches in plain view of the victim. They had recently come from the home of Adam McKinney, a member of this group, where they had smoked some marijuana and drank some alcoholic beverages. These friends testified that Appellant neglected to place money into the common fund they collected for food purchases that day at the fish store and that moments after the victim departed, Appellant told his friends that he had something to do, adding he would meet them later in the evening at Adam McKinney's house. Appellant quickly left the fish store.

> No one saw the Appellant, or the victim, until approximately 4:15 p.m. or 4:30 p.m. when Edgar Coder and Travis Wolfe stated that they saw the Appellant and the victim on the Silver Bridge (so named because of its color). They were the last people to see the

victim alive.

These witnesses testified that, although they could not hear what the Appellant and the victim were saying to each other, they appeared to be arguing. In addition, Edgar Coder testified that the Appellant had what appeared to be a large stick in one of his hands. Sometime between 4:45 p.m. and 5:00 p.m., another witness, Kevin Hartmen, while walking his dog there, noticed a body under the Maryland-Pennsylvania Railroad Bridge (hereinafter the "Black Bridge" so named because of its painted color). (The Black Bridge is in close proximity to the Silver Bridge and both of these structures span the Codorus Creek.) Kevin Hartmen immediately contacted his friend, Donald Snell, who also saw the body. Mr. Snell approached his father about what he had seen. His father then told a retired policeman. In turn, the retired policeman contacted the York Police Department and reported the body beneath the Black Bridge.

The police arrived at the scene at 8:35 p.m. and began their investigation. The police found the victim's numerous articles of clothing, her torn open, empty wallet, along with her upper and lower dentures strewn around her lifeless, nude body. The autopsy revealed the victim was beaten to death by a blunt instrument and the cause of death was later determined to be a subdural hemorrhage or brain hemorrhage ....

While the police were investigating the murder scene, Appellant, armed with an axe handle, went to a local bar called the Shady Dell. Before he was permitted to enter the bar, the manager, John Ettline, ordered Appellant to leave this club outside because Mr. Ettline did not want patrons carrying weapons into his establishment. Appellant complied and meandered through the Shady Dell for a time and left without re-claiming his stick. From there he proceeded to Adam McKinney's home.  When he arrived at Adam's home, Appellant now possessed alcohol, marijuana, and money.  Appellant did not tell his friends where he had been, what he had done, or where he obtained the money to make his purchases, whereas a few hours before he did not have funds to contribute to their kitty.

Over the next few months the police engaged in an exhaustive investigation. The questioning of witnesses revealed that the Appellant often carried an axe handle, that he told his friends the police considered him a prime suspect, and that the

police stopped Appellant as he was attempting to leave town. Debra Phillips, a woman who knew the Appellant, told the police she gave the axe handle to him because of a foot injury he received in an altercation with Debra's nephew some time before the murder. At that time, she suspected he could use the handle as a cane. Intense questioning of the Appellant's acquaintances confirmed that on the day of the murder the Appellant was seen carrying this axe handle. Their testimony also revealed that when he entered the fish store on the day of the murder, he had the axe handle with him but the owners requested he leave it outside. When Appellant's friends left the fish store after the Appellant had departed, they noticed that the stick was gone. And finally, they noted that the Appellant did not have "his stick" when he rejoined them later in the evening at Adam's house.

On December 9, 1986, while Appellant was in the York County Prison on charges unrelated to this incident, he confided in two fellow prisoners, Jeffrey Hutchenson and Richard Taylor, and told them that he had killed the victim. Appellant said, "that when he asked the victim for her money and she refused, he hit her and took the money." The next day Jeffrey Hutchenson contacted his attorney, who notified the police.  An arrest warrant was then issued on December 12, 1986, for the Appellant.

*Chambers-1*, at 633-35.

As the Pennsylvania Supreme Court recognized, the Commonwealth's case against the petitioner was based entirely on circumstantial evidence (including the confessions). *Id.* at 635 (acknowledging that "there were no eyewitnesses to the robbery or the murder" and "all of the evidence was circumstantial").

The respondents summarize the Commonwealth's forensic case at trial as follows:

[T]he Commonwealth presented the testimony of chemist Janice A. Roadcap, of the Pennsylvania State Police Crime Laboratory. Roadcap testified as to the various pieces of evidence submitted to the Pennsylvania Police Crime Laboratory in

6

connection with Petitioner's case including six items containing blood, and numerous hairs recovered from the crime scene. All blood evidence, except for one piece determined to be of insufficient quantity for testing, was determined to be of Type O blood. All hair samples found at the scene, with the exception of one, were determined to be either consistent with the victim's hair or of non-human origin. The hair sample found to be inconsistent to that of the victim was never compared to any sample of Petitioner's hair, and the blood samples were never compared to that of the Petitioner.

(Responsive Brief at 7) (internal citations to record omitted).

The petitioner asserts that none of the "blood and hair evidence at the crime scene . . . was in anyway connected to Petitioner." (Petitioner's Opening Brief at 7-8.) Likewise, the State Police Crime Laboratory found no genetic material belonging to the victim on the axe handle. (Petitioner's Opening Brief at 8.)

## III.    STANDARD OF REVIEW

In evaluating the merits of a state prisoner's habeas petition, the federal court must generally defer to the decisions of the state courts.  A district court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see* *Williams v. Taylor,* 536 U.S. 304, 412-13 (2000) (Stevens, J.). A decision by a state court is "contrary to . . . clearly established federal law" "if the state

court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *Harrington v. Gillis*, 456 F.3d 118, 124 (3d Cir. 2006) (Alarcon, J.); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 887-88 (3d Cir.) (*en banc*), *cert. denied*, 528 U.S. 824 (1999).  A decision by a state court unreasonably applies federal law if "the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413; *Harrington*, 456 F.3d at 124.

The application of § 2254(d)(1) entails two steps.  First, the court must determine whether "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *Matteo*, 171 F.3d at 888 (quoting *O'Brien v. Dubois*, 145 F.3d 16, 24-25 (1st Cir. 1998), *overruled in part on other grounds by McCambridge v. Hall*, 303 F.3d 24 (1st Cir. 2002)). Then, if the court determines that the state court's decision was not "contrary to" federal law, "either because the state court decision complies with the Supreme Court rule governing the claim, or because no such rule has been established," the court must determine whether the state court's application of federal law was an "unreasonable application" of the Supreme Court rule. *Id.* at 889. Unreasonableness is an objective determination; a state court decision is unreasonable if, "evaluated objectively and on the merits, [it]

8

resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.* at 889-90; *see Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (O'Connor, J.).


## IV.   DISCUSSION

Petitioner seeks summary relief from his conviction and/or current sentence. (Petitioner's Opening Brief at 6, 49.) In lieu of summary relief, petitioner seeks an evidentiary hearing. *Id.* at 6. Petitioner's Opening Brief puts forward six legal theories in support of relief.  This recommendation and report responds to each legal theory in turn.

### A.   Petitioner's Ineffective Assistance Of Counsel Claim

Petitioner contends that he is actually innocent of the murder for which he was convicted. *See, e.g.*, Reply Brief at 1 ("Petitioner is innocent."); *cf., e.g.*, Petitioner's Opening Brief at 9 ("[T]he circumstances of the police investigation leading up to Petitioner's arrest ... demonstrate[]  ... that there is more than a reasonable likelihood that Petitioner is innocent."). He further contends that "trial counsel's failure to obtain independent testing of physical evidence in an effort to demonstrate that Petitioner was not the murderer" constituted ineffective assistance of counsel (hereinafter the "IAC Claim"). *Id.* at 18 *et seq.*; *id.* at 19 (making a similar point in regard to the fact that trial counsel also failed to make the discovery request during (or for use during)

the 1994 resentencing proceedings). The IAC Claim was made (and exhausted) in PCRA proceedings in conjunction with a then-concurrent request for discovery of that physical evidence. *Id*. at 19. The discovery request was turned down by the trial court and the Pennsylvania Supreme Court. Petitioner claims that this was "court error" (hereinafter the "Court Error Count") and denied him his federal "due process" rights. *Id*. at 19, 22 *et seq*.

Petitioner's position is that trial counsel could have "attempt[ed] to secure scientific analysis of the [crime scene material[4] and petitioner's axe handle] to determine if it could rule out Petitioner as a suspect." *Id*. at 19. "Counsel's failure to obtain testing and evidence that would exonerate petitioner constitutes prejudicially deficient performance in violation of the Sixth and Fourteenth Amendments." *Id*. at 19-20. Specifically petitioner argues, in a wholly conclusory fashion, that "[t]here is no question, that if blood found at the scene was neither Petitioner's nor the decedent's, Petitioner's guilt would be remote and any reasonable juror would have found Petitioner not guilty," *id*. at 20, and termed the PCRA Court's[5] refusal to grant

---

[4] Crime scene material collected by the police at the crime scene includes, *inter alia*, blood "on a stone, in two samples of snow, on a pair of pantyhose, a sock, and on a sapling stick;" and hair samples "on numerous articles of clothing and in both hands of the victim." Petitioner's Opening Brief at 19 (citing Pennsylvania State Police Laboratory Report).

[5] *See Commonwealth v. Karl Chambers*, No. 42 CA 1987 (York County C.P. Mar. 8, 2000) (Erb, J.) [hereinafter "PCRA Opinion" and "PCRA Court"], *aff'd*, *Chambers-3.* (The PCRA Opinion appears at docket number 50 in the instant litigation. Transcripts to the PCRA hearing appear at docket numbers 47, 48, and 49.)

access to the sought after evidence "inexplicable." *Id*.

### 1.    The Legal Standard For Evaluating An IAC Claim

The legal test for establishing an ineffective assistance of counsel claim is well-settled. The Constitution guarantees criminal defendants the effective assistance of counsel, U.S. CONST. amend. VI, which is measured by "reasonableness under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (O'Connor, J.). To establish a violation of that right, a petitioner must make two showings. First, he "must show that counsel's performance was deficient." *Id.* Counsel is deficient if, "on the facts of the particular case, viewed as of the time of counsel's conduct," counsel's conduct was unreasonable. *Id.* at 690. There is a strong presumption that counsel is effective. *Id.*; *see id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Second, petitioner must affirmatively show that the deficient performance "prejudiced the defense." *Id.* at 687, 693. Prejudice means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694-95. In assessing prejudice, the court must consider the totality of the evidence that was before the fact finder. *Id.* at 695.

As explained, the respondents have responded to petitioner's factual allegations and legal theories. *See* Responsive Brief; *see also* Rule 5(b) of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254 (mandating that the answer "address the allegations in the petition"). Additionally, respondents have requested that Chambers' petition be denied. *See* Responsive Brief at 1. The Court evaluates the Responsive Brief and the relief sought under the standard applied to a motion to dismiss. *See* Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254 (prescribing application of the Federal Rules of Civil Procedure in habeas proceedings). *See generally Bond v. Procunier*, 780 F.2d 461 (4th Cir. 1986) (affirming dismissal of § 2254 petition under Rule 12(b)(6) standard); *Sanchez v. United States*, Civil Action No. 07-3790 (SRC), 2008 WL 141214 (D.N.J. Jan. 11, 2008) (denying habeas petitioner bringing an ineffective assistance of counsel claim relief, and dismissing the petition, in the context of the prosecution's motion which the court evaluated under the Rule 12(b)(6) standard); *Perez v. United States*, Civil Action No. 07-1393 (SRC), 2007 WL 2442446 (D.N.J. Aug. 22, 2007) (denying habeas petitioner relief, and dismissed the petition, in the context of the prosecution's motion which the court evaluated under the Rule 12(b)(6) standard). In doing so, the Court focuses on the substance of the filing and the relief sought, as opposed to how the document was formally stylized.

Under prior case law the standard for Rule 12(b)(6) was "[d]ismissal for

failure to state a claim is appropriate only if it 'appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003) (Hall, J.) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (Black, J.)). The *Conley* courts "no set of facts" language was "retir[ed]" by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1969 (2007).[6] Under *Twombly*, the allegations of the complaint should "plausibly suggest[]" that the pleader is entitled to relief. *Twombly*, 127 S. Ct. at 1966. Thus, under *Twombly*, the factual allegations in the complaint must not be "so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8." *Phillips*, 515 F.3d at 233. In addition, "it is no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'" *Id.* (alteration in original) (quoting *Twombly*, 127 S. Ct. at 1969 n. 8). Moreover, the Third Circuit has explained that *Twombly*'s emphasis on "plausibility" means that a complaint's "[f]actual allegations must be enough to raise a right

---

[6] Although *Twombly* was an antitrust case, the Third Circuit has held that the new standard for evaluating motions to dismiss applies to other areas of substantive law. *See, e.g.*, *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (Nygaard, J.) (applying *Twombly* in a civil rights case governed by 42 U.S.C. § 1983). The Court holds, as have other courts, that *Twombly* applies in the habeas context as well. *See, e.g.*, *Sanchez*, Civil Action No. 07-3790 (SRC), 2008 WL 141214, at *2 (applying *Twombly* in the habeas context); *Perez*, Civil Action No. 07-1393 (SRC), 2007 WL 2442446, at *2 (same).

to relief above the speculative level." *Phillips, 515 F.3d at 234* (quoting *Twombly*, 127 S. Ct. at 1965). "That is to say, there must be some *showing* sufficient to justify moving the case beyond the pleading to the next stage of litigation." *Phillips*, 515 F.3d at 234-35 (emphasis added); *see also Wilkerson v. New Media Tech. Charter School Inc*., 522 F.3d 315, 322 (3d Cir. 2008) (Sloviter, J.) ("Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the pleader not only to provide a 'short and plain statement,' but also a statement 'showing that the pleader is entitled to relief.'") (quoting *Phillips*, 515 F.3d at 231).

> The second important concept we take from the *Twombly* opinion is the rejection of *Conley's* "no set of facts" language. The *Conley* language was problematic because, for example, it could be viewed as requiring judges to *speculate about undisclosed facts*. "This famous observation," the Court held, "has earned its retirement. The ['no set of facts'] phrase [in *Conley*] is best forgotten as an incomplete, negative gloss on an accepted pleading standard: Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S. Ct. at 1969 n. 8. After *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead "a complaint must allege facts suggestive of [the proscribed] conduct." *Id.*

*Phillips*, 515 F.3d 232-33 (emphasis added). In short, in considering a motion to dismiss, the objective of review is to determine whether the complaint "contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 127 S. Ct. at 1969. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of"

necessary elements of the plaintiff's cause of action. *Id.* at 1965.[7]

## 2.    Application Of The Legal Standard To The Instant Case

Petitioner's *only* factual allegation in support of his IAC Claim is that his trial attorney "made no attempt [at trial or during resentencing proceedings] to secure scientific analysis of [blood and hair crime scene] material to determine if it could rule out Petitioner as a suspect." *See* Petitioner's Opening Brief at 18-22. This factual claim is *not* in dispute; hence it supplies no justification for any hearing. *See* Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254 (describing hearing as an "*evidentiary* hearing") (emphasis added); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991) (Greenberg, J.)

---

[7] *See also Phillips*, 515 F.3d at 234 ("The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough [allegations of] fact[] to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (quotation marks and citations omitted). The *Twombly* standard is particularly appropriate in the habeas context. *See supra* note 6 collecting case law applying *Twombly* in the habeas context). In a mundane civil law suit, prior to discovery, prior to the development of an evidentiary record, plaintiffs, through their attorneys, may make good faith factual allegations based on information and belief. *See, e.g.*, Fed. R. Civ. P. 11(b). In the habeas context, by contrast, a petitioner pursues relief after conviction beyond a reasonable doubt as to each element of the crime and after prior proceedings have produced a voluminous written record. In short, many of the facts necessary to establish a petitioner's habeas claim are within easy reach of petitioner *even absent discovery*. Factual allegations based on the evidentiary record should be pled in a habeas petitioner's petition (or the related opening brief where the brief functions as the petition).

(holding that a district court must hold an evidentiary hearing if "necessary to establish the truth of those allegations").

Moreover, even if petitioner's lone factual allegation were incontestably established by record evidence, that lone fact would not be sufficient reason to grant habeas relief (or to grant an evidentiary hearing). *See id.* ("We reiterate that a district court must hold a hearing if a petitioner has alleged facts that, if proved, would entitle him or her to relief ...."). There are three reasons for this:

*First*, although petitioner states, in a conclusory fashion, that his attorney's failure to request the scientific evidence constitutes "prejudice," Petitioner's Opening Brief at 21-22, this is hardly obvious. The record reflects that petitioner confessed to as many as three separate individuals. *See Chambers-3*, 807 A.2d at 885; *Chambers v. Beard*, 3:06-cv-980, slip op. at 35 (M.D. Pa. Mar. 5, 2008) (Nealon, J.) ("Petitioner confessed his guilt to his friend, Roy Phillips, which was confirmed by April Wright, and to two fellow prisoners.") (hereinafter "Nealon Opinion"). (Doc. No. 40.) Those confessions fully support the jury's verdict. Moreover, as the District Court explained in prior proceedings "[e]ven the absence of Petitioner's DNA or the presence of a third person's DNA is not in itself exculpatory." Nealon Opinion at 35. The absence of scientific evidence connecting petitioner to any particular (or all of) the crime scene materials does not prove he was absent from the scene. Unlike a *victim*, it is possible for a *perpetrator* of a murder to leave no blood

16

or hair evidence behind. The absence of crime scene evidence is only evidence of the alleged perpetrator's absence when such evidence is expected.[8] In short, petitioner's allegations, even if true, do not constitute prejudice under *Strickland's* second prong.

*Second*, the fact that petitioner's attorney failed to request the scientific evidence at trial and during resentencing proceedings does not – standing alone – establish that "counsel's representation fell below an objective standard of reasonableness," as required by *Strickland's* first prong. *Strickland*, 466 U.S. at 688. As the District Court explained, "[i]n Pennsylvania, DNA testing was not fully endorsed by the [state] courts until 1992, five years after Petitioner's conviction." Nealon Opinion at 32 (collecting state and federal case law). Acting under the apparent assumption that petitioner's trial counsel was duty bound to make new Pennsylvania case law five years ahead of actual events, petitioner's counsel in these proceedings argues that "Defense counsel [at trial] is under an ethical obligation 'to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and to a degree of guilt or

---

[8] See *Logmans v. Moore*, Civil Action No. 02-5622 (JAP), at *16 (D.N.J. Apr. 29, 2005) ("Even if the results showed that the blood was not Logmans, that fact alone would not have exonerated him since there was no evidence or testimony [at trial to the effect] that the assailant had bled during the attack."); *cf.* Aaron-Andrew P. Bruhl, Response, *Against Mix-and-Match Lawmaking*, 16 CORNELL J.L. & PUB. POL'Y 349, 361 (2007) ("Absence of evidence is sometimes evidence (which is not to say conclusive evidence) of absence, notably when the evidence is expected.").

penalty.'" Petitioner's Opening Brief at 22 n.14 (quoting *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980) (per curiam) (quoting A.B.A. Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function § 4.1 (tent. draft 1970))). Petitioner's statement of the standard for reasonableness is accurate, but incomplete. It is, on some occasions, a rational, strategic, and professional choice for an attorney *not* to pursue a line of inquiry.[9] *Baynes*, the case quoted by petitioner, is illustrative of the point. In *Baynes*, counsel was found ineffective for failure to "obtain a *copy* of the voice exemplar [*i.e.*, the tape in the prosecution's possession] and utilize [scientific testing] to disprove that [the subsequently convicted client] was the person involved in the incriminating telephone conversation." *Baynes*, 622 F.2d at 68 (emphasis added). Such a copy would have permitted the attorney to test his client's voice against that on the prosecution's tape. Furthermore, the results of counsel's test would have only been known to defendant's counsel, but not to the prosecution, because the test would have been conducted on a *copy* of the prosecution's tape, not on the *original*. In *Baynes,* there was no downside to conducting the test. In the instant case, by contrast, petitioner complains of his trial counsel's

---

[9] *Cf. Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.") (emphasis added).

failure to demand "independent" testing of the blood and hair evidence, *i.e.*, testing of physical evidence in the prosecution's possession. The Court is aware of no statute or common law rule which would have required the prosecution to turn over such physical evidence. At best had petitioner's trial attorney requested scientific testing prior to trial, the state court may have ordered the state either: to conduct the tests and send the results to petitioner's trial counsel or, alternatively, to conduct the tests in the presence of petitioner's representatives. In either event, the results would have been known to the prosecution. Thus the tests here, unlike those in *Baynes*, would have posed some strategic risk to the petitioner, depending on their results. Petitioner makes no factual allegations which, if proven, would establish that counsel knew or should have known that the results of scientific testing would have proven exculpatory.  Moreover, the absence of scientific testing left trial counsel free to argue that the prosecution's case was entirely circumstantial. From which it might be argued that trial counsel's strategy failed, but a failed strategy does not establish that trial counsel's strategy was unreasonable at the time it was made.

*Third*, it is possible to imagine that discovery might reveal a constellation of facts establishing or tending to establish that trial counsel's failure to request scientific testing of the physical evidence fits within the rubric of an ineffective assistance of counsel claim. But it is also possible to imagine any other number of factual scenarios in which trial counsel's decision *not* to seek

19

scientific testing was part of a reasonable strategy, *i.e.*, situations in which discovery would not lead to evidence establishing petitioner's IAC Claim.[10]

Moreover, there is good reason in the record to believe that discovery will not lead to the discovery of evidence establishing petitioner's implausible IAC Claim. Petitioner cites *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992), for the proposition that "counsel [is] ineffective when he failed to conduct forensic investigations." However, *Sims* is distinguishable from the instant litigation. In *Sims*, the habeas petitioner had already examined his trial attorney in state court post-conviction proceedings. In those proceedings his former counsel stated that "he made no independent investigation of the alleged crime and offered no explanation for why he did not take advantage of the FBI report." *Id*. at 1580 (internal quotation marks omitted). In short, there was an evidentiary basis in the record to support the assertion that counsel's inaction was *per se* unreasonable. In the instant litigation, by contrast, the state Supreme Court rejected Chambers' IAC Claim in PCRA proceedings because:

> Chambers' allegation that trial counsel was ineffective for failing
> to request this discovery cannot succeed. Chambers failed to
> question his trial counsel at the PCRA hearing to determine why

---

[10] In other words, Chambers' petition may have survived scrutiny under *Conley v. Gibson*, *supra*, where courts were arguably permitted to speculate in regard to facts not pled, but not under the Supreme Court's recently announced *Twombly* standard. *Twombly*, 127 S. Ct. at 1971 ("[N]othing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of [proscribed conduct].").

counsel did not seek blood testing of both Chambers and Morris at the time of the original trial and trial counsel did not explain his inaction in the Affidavit that Chambers submitted to the PCRA court.

*Chambers-3*, 807 A.2d at 889. If Chambers' trial counsel had no strategy justifying his refusal to request the scientific evidence, one would expect the record (before the PCRA Court) to reflect that fact.[11] Moreover, the absence of any such citation to the record (or even a particularized proffer that such a citation is possible) strongly suggests that any ineffective assistance of counsel claim is implausible, particularly given that trial counsel testified to other matters during PCRA proceedings. *See* Petitioner's Opening Brief at 14 n.11 (admitting that trial counsel testified in PCRA proceedings); *Twombly,* 127 S. Ct. at 1966.

Moreover, challenges to an attorney's performance are assessed under a "highly deferential" standard and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the *presumption* that, under

---

[11] In petitioner's Reply, Chambers argues "there is no evidence from the state court proceedings that trial counsel had any strategic or tactical basis for not requesting testing or hiring an expert. That evidence was not explored during post-conviction proceedings because counsel was precluded from obtaining the discovery and testing necessary to develop his claims."  Reply at 4-5 (citing Petitioner's Opening Brief at 23-24). However, neither the Reply, nor the Petitioner's Opening Brief cite any place in the record of proceedings before the PCRA Court where the petitioner sought trial counsel's testimony and was precluded from inquiring about trial strategy. If Petitioner's position is that state court error precluded petitioner's PCRA counsel from deposing his trial counsel, he has made no showing to that effect.

the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Whether petitioner's trial attorney's decision not to seek the scientific evidence at issue here was reasonable (or not) depends on what sort of investigation he conducted prior to trial (including what, if anything, Chambers told his attorney those tests might reveal), what sort of investigation he failed to conduct but should have, what reasonable inferences (if any) he drew from that investigation, and what inferences he failed to draw but should have. *See United States v. Gray*, 878 F.2d 702 (3d Cir. 1989) (Sloviter, J.) (holding that "a strategic choice against pursuing a certain line of investigation" requires first "obtaining facts on which such a decision could be made"). But here, Chambers' Opening Brief makes no concrete allegations in regard to the nature, shape, or contours of trial counsel's pre-trial strategy; there is not even a proffer in regard to such information. In other words, the Chambers' petition, a functional complaint, fails to allege facts about counsel's pre-trial investigation and the conclusions trial counsel drew (or should have drawn) from that investigation. Without allegations as *to those* facts, facts relating to petitioner's trial attorney's pre-trial investigation and strategy determinations, there is no reason to believe that petitioner's trial attorney acted unreasonably.[12]

---

[12] This is particularly true where "we have an obvious alternative explanation." *Twombly*, 127 S. Ct. at 1972. Here, the obvious explanation is that the trial attorney wished to leave the government with its entirely

In short, Chambers' petition, like the failed complaint in *Twombly*, fails to "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 127 S. Ct. at 1969. Absent such a showing, there is no reason to allow the petition to advance to the next stage of litigation, *Phillips*, 515 F.3d at 234-35; absent such a showing petitioner has failed to make sufficient allegations that would in themselves (if proven) overcome the highly deferential presumption in favor of finding attorney conduct reasonable, *Strickland*, 466 U.S. at 689.

### 3. The IAC Claim In Regard To The Resentencing Proceedings

Similarly, to the extent that petitioner is arguing that petitioner's counsel was ineffective during the 1994 resentencing proceedings, including *Chambers-2*, this claim founders for similar reasons. Petitioner's Opening Brief at 19, 20. Petitioner has made no showing establishing or tending to establish that his counsel's performance at the resentencing was beneath

---

circumstantial case, in the hope that that would, in itself, generate reasonable doubt. One reason, then, "not to go there" was that the prosecution's scientific witness was left in the uncomfortable position of explaining to the jury that although she "usually [had a sample of the victim's blood] in homicide cases," she had no such sample here. Petitioner's attorney was left free to emphasize this point during cross-examination and at closing and to make the coordinate point that no physical evidence actually tied the petitioner to the victim or to the crime scene. *See* Nealon Opinion at 32-33 ("[T]rial counsel could not have known the results of DNA testing, assuming it was available, and his trial strategy, which was to argue that there was no physical evidence linking Petitioner to the crime, could have been compromised by DNA tests.").

professional standards. Moreover, petitioner has failed to put forward any argument or legal theory indicating how the sought after scientific evidence would have been relevant to mere resentencing proceedings where the underlying conviction had already been established. *See, e.g.*, *Marshall v. Cathel*, 428 F.3d 452, 468 (3d Cir. 2005) (Rendell, J.) ("[T]he penalty phase is a different animal, where the stakes are completely different from those encountered in the guilt phase.").

> The guilt trial establishes the elements of the capital crime. The penalty trial is a trial *for* life. It is a trial for life in the sense that the defendant's life is at stake, and it is a trial *about* life, because a central issue is the meaning and value of the defendant's life.

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 303 (1983). Counsel's failure to request access to scientific evidence that would have been irrelevant or inadmissible to the resentencing proceedings (i.e., evidence pertaining to guilt or innocence) cannot be said to be unreasonable. *See* Nealon Opinion at 33-34.

## B.    Did the PCRA Proceedings Violate Petitioner's Due Process Rights and Rights To A Fair Hearing?

Petitioner's Opening Brief argues – in somewhat opaque language – that "the PCRA court's decision to deny Petitioner access to th[e] evidence [sought in discovery] during the PCRA proceedings violated Petitioner's separate and distinct federal due process rights and his rights to a full and fair

hearing." Petitioner's Opening Brief at 22. Petitioner continues:

> The state [supreme] court rejected Petitioner's ineffective assistance of counsel claim on the basis that Petitioner failed to present testimony from trial counsel regarding his reasons for failing to obtain the required forensics testing. *Chambers-3*, 807 A.2d at 889. The state [supreme] court's conclusion ignoring the PCRA Court finding that Petitioner was not entitled to the testing, essentially puts the cart before the horse. By precluding Petitioner from any access or opportunity to conduct testing, the state court also precluded from demonstrating that such testing would have been exculpatory. Counsel's reasons for not requesting such testing under these circumstances is, therefore meaningless and, as it was the state court that precluded Petitioner from developing the necessary factual basis for the claim, federal review is both proper and required under controlling federal precedent.

Petitioner's Opening Brief at 23-24.

However, Petitioner cites no state statute or principle of state law and no federal statute or controlling principle of federal law announced by the Supreme Court of the United States from which one could conclude that the state PCRA Court erred, much less that Petitioner was denied "federal due process rights" or a "full and fair hearing." *Id*. at 22. The gravamen of petitioner's claim is that once the state allows for collateral review, the state must provide unlimited discovery if it is conceivable that such further discovery could "develop the factual basis" for an innocence claim irrespective of trial counsel's reasons for not seeking discovery prior to the initial trial court proceedings. Simply put, there is no such principle of federal law; and for good reason. The federal constitutional right to a fair trial is a right to *a* fair trial, not to multiple trials. *See* U.S. CONST. amend. VI (defining Sixth

25

Amendment trial rights in reference to "*a* speedy and public trial") (emphasis added).  If petitioner's position were the law, trial attorneys would have every reason not to seek out evidence, not to pursue discoverable materials, and not to interview witnesses in advance of, and for use during, the initial trial because any evidence left undeveloped could be had as a matter of right in collateral review proceedings. Indeed, if trial attorneys had as a matter of right access to unlimited discovery in PCRA proceedings (*i.e.*, where such discovery might develop the factual basis of an innocence claim), they could, arguably, be duty bound *not* to develop the record, evidence, and witnesses, where such inquiry might otherwise jeopardize their trial strategy or otherwise limit what representations the client's attorney could make in open court. *Cf.* *Wainwright v. Sykes*, 433 U.S. 72, 89 (1977) (Rehnquist, J.) (rejecting "the rule [stated in] *Fay v. Noia*, [which] broadly stated, may encourage 'sandbagging' on the part of defense lawyers, who may take their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off. "). In this situation, every defense attorney would simply wait and see if the government could prove its case, rely on the beyond-a-reasonable-doubt burden of proof in criminal actions, and if that "strategy" failed, the defense could actively pursue evidence in PCRA proceedings, which would effectively become a second trial. *Cf. United States v. Mansfield*, 33 M.J. 972, 985 (A.F.C.M.R. 1991) ("The appellant is not entitled to a risk-free rehearing,

but to a fair trial.").

As to petitioner's argument that "Counsel's reasons for not requesting such testing under these circumstances is ... meaningless " it is incorrect for similar reasons. *If*, for example, trial counsel failed to request such testing as part of a conscious, developed trial strategy, acting on full information, with client consent, then petitioner waived his right in regard to such discovery. *If*, on the other hand, there was no such waiver, then PCRA counsel should have examined trial counsel in PCRA proceedings in order to establish both the IAC Claim and the absence of waiver in regard to discovery. *Chambers-3, 807 A.2d at 889* ("Chambers has failed to prove that his trial counsel did not have a reasonable strategic basis for not seeking blood testing."). In her brief, petitioner's habeas counsel makes allegations to the effect that trial counsel had no such strategy. But such allegations are wholly conclusory: petitioner points to no evidence in the record establishing that factual allegation and makes no proffer of such evidence. Indeed, as the State Supreme Court explained: such evidence if it exists should have been established in the record, but it was not. *Id.* Given the absence of evidence, *i.e.*, in particular the absence of evidence where evidence is expected, petitioner's theory – an absence of knowing waiver of discovery in trial court proceedings – is rejected as implausible. *See Twombly*, 127 S. Ct. at 1971 ("[N]othing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of [proscribed conduct]."). Thus petitioner's due process claim

27

should fail.

### C. Did the Commonwealth Fail To Disclose Exculpatory *Brady* Evidence?

Petitioner argues that "[t]he Commonwealth improperly withheld from Petitioner critical exculpatory evidence indicating that someone other than Petitioner had killed Ms. Morris." Petitioner's Opening Brief at 27. Specifically, on or about September 5, 1986, a time prior to petitioner's arrest, Wendell Murray, an inmate in the York County prison, made a statement to the York County District Attorney and to Detective Follmer – the police officer investigating the circumstances surrounding the murder of Anna Mae Morris. *See* Petitioner's Opening Brief at 29. *But see* PCRA Opinion at 8 (reporting date of meeting with Murray as September 8, 1996). Officer Follmer made a report of that meeting.  Apparently, his report was not turned over to petitioner prior to trial (although this was, in fact, contested in earlier proceedings). The report records Murray's description of Murray's (purported) February 1986 meeting with a Hispanic male who went by the name "Magic." Petitioner's Opening Brief at 29; PCRA Opinion at 8.

Murray reported that at that February meeting, Magic allegedly confessed to having committed a crime. Magic stated: "I didn't mean to knock the old lady down." Petitioner's Opening Brief at 30. The details of Magic's purported confession had some resemblance to the facts and circumstances surrounding the murder of Anna Mae Morris. At the PCRA hearing Murray

testified that "he was hoping that in exchange for his information, he would receive consideration on the charge [then] pending against him." PCRA Opinion at 8. However, "Mr. Murray never received any consideration on his sentence, and so [prior to testifying] he [had already] withdr[awn] his statement [to the police]." *Id*. Nevertheless, Follmer conducted an investigation and concluded that the events described by Magic were not linked to the Morris murder; rather, Follmer concluded that Magic was Ricardo Valentine and that the events described by Murray were linked to the robbery of one Ms. Myers. *Id*. at 11. Notwithstanding that Murray had previously withdrawn his statement, at the subsequent PCRA hearing, Murray reaffirmed his original statement to the police.

At the PCRA hearing and on appeal to the State Supreme Court, petitioner argued that this material was *Brady* material and further argued that habeas relief was warranted for the prosecution's failure to turn over this material. The PCRA Court held that "[t]he Murray report was a fruitless lead which contained information about an entirely different crime committed by a person who was not connected to the Anna Mae Morris murder." *Id*. at 13-14 (footnote omitted).  Furthermore, the PCRA Court – which heard Mr. Murray's testimony – found that "even if the defense would have used [the] Murray' [sic] report to cast blame on Magic, Mr. Murray would have been viewed [by the jury] as incredible because of ... his long delay in reporting what he heard to the police, and his withdrawing of the statement after failing to receive

29

consideration on his sentence." *Id*. at 16 (citing the PCRA hearing transcript). After a full analysis of the pertinent facts and case law, *i.e.*, an adjudication on the merits of the *Brady* claim, the PCRA Court rejected petitioner's position. *See id*. at 8-17. The PCRA Court's analysis was affirmed on appeal by the State Supreme Court. See *Chambers-3*, 807 A.2d 887-89.

Both state courts assumed that the Murray report was *Brady* material. On the assumption that the Murray report was *Brady* material, the Court finds that the state courts' two decisions in regard to petitioner's *Brady* claim "was [neither] contrary to, [n]or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 536 U.S. 304, 412-13 (2000). Each state court opinion correctly "identifie[d] the correct governing legal principle from th[e Supreme] Court's decisions [and] []reasonably applie[d] that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413; *Harrington*, 456 F.3d at 124.

It is entirely reasonable, however, to hold in the alternative that the Murray report was not *Brady* material, and for that reason it naturally follows that petitioner's *Brady* claim fails. According to the Murray report, Murray told Follmer that Magic entered the apartment some time over the course of "Friday night-Saturday morning." Petitioner's Opening Brief at 29. The murder, however, did not occur until some time after 3:30 p.m. Saturday, February 1, 1986.  So if the report accurately reflects the actual events, then any crime

confessed to by Magic could not have been related to the Morris murder. On its face, the Murray report would not be *Brady* material simply because it was not exculpatory evidence. *See United States v. Wecht*, 484 F.3d 194, 207 n.15 (3d Cir. 2007) (Fuentes, J.) (explaining that "*Brady* held that the government must turn over exculpatory evidence to defendants"). Notwithstanding the rule announced in *Brady v. Maryland*, 373 U.S. 83 (1963) (Douglas, J.), criminal actions remain adversary procedures. Under *Brady*, defendants are not entitled to unlimited or to general discovery from the prosecution; rather, the government's obligation to turn over material in its possession extends only to exculpatory information, not to any potentially relevant document. *Id.*; *see also* Christopher Deal, *Brady Material Before Trial*, 82 N.Y.U. L. REV. 1780, 1785 (2007) (explaining that *Brady* jurisprudence "does not require undermining the adversarial system by mandating discovery of all or most of the evidence in the prosecutor's file"). In short, *Brady* material must be exculpatory, *i.e.*, the four corners of the report itself must be exculpatory evidence. The mere possibility that petitioner's counsel may have developed other witnesses or lines of defense had the report been turned over prior to trial does not put the report within the orbit of the *Brady* rule.

To bring the Murray report within the *Brady* rule, petitioner argues:

Mr. Murray confirmed the contents of the police report and, furthermore, cleared up the only possible discrepancy between his statement and the facts of the murder. While the report

31

> [actually] indicates that Mr. Murray <u>believed</u> the two men came to his apartment on a Friday night - Saturday morning in February 1986 (and Ms. Morris was found under the bridge late in the afternoon of February 1, 1986, a Saturday), Mr. Murray testified that in fact he told the police that it was over the weekend – <u>a Friday, Saturday, or Sunday</u>. As he explained on cross-examination, he spent weekends at Deb's apartment [where he purportedly met Magic] but was not there during the week.

Petitioner's Opening Brief at 35 (citing PCRA Trans. 9/30/99 at 28). There are any number of reasons to reject Murray's testimony and petitioner's characterization of it. *First*, it was equivocal. At the PCRA hearing, Murray could not place the date and time of his purported meeting with Magic.[13]

*Second*, Murray had a drug problem at the time of the underlying events. PCRA Trans. 9/30/99 at 27 (Murray: "Well, it's no secret to the courts that I had a drug problem. So basically I hung out there on Fridays, Saturdays, and Sundays.").

*Third*, it is contradicted by the actual text of the report as recorded by Detective Follmer.

And, *fourth*, Follmer, like Murray, testified at the PCRA hearing, and Follmer testified to the report's accuracy, *i.e.*, Follmer testified that Murray had

---

[13] The PCRA hearing transcript records the following exchange:

Q:   Now, you testified that two Puerto Rican males came into the apartment on a Friday, Saturday, or Sunday, you're not quite sure which.

A:   Yes.  It was in the morning hours.  I don't know if it was Friday or Saturday or Sunday morning hours.

PCRA Trans. 9/30/99 at 27.

stated that Murray's purported meeting with Magic took place over the course of "Friday night and Saturday morning."  PCRA Trans. 8/23/99 at 89.

Moreover, even if the Court fully credits the prisoner's PCRA hearing testimony, at most that testimony establishes what Murray *told* (or what he believes he told) the prosecutors and the police.  Murray's testimony does not establish what the prosecutors and the police *heard* or *understood*.  Follmer's understanding of his interview with Murray is established by his contemporaneous recording of that interview in the form of his report and his PCRA hearing testimony. Nothing stated by the prisoner squarely contradicts Follmer's understanding of what transpired at that interview. *Brady* requires the prosecution to turn over exculpatory evidence in its "possession." *United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991) (Higginbotham, J.) (holding that the prosecutor's *Brady* obligation extends to evidence in its "possession" or was otherwise "readily available"); Deal, *Brady Material Before Trial*, 82 N.Y.U. L. REV. at 1782  (explaining that the prosecutor's *Brady* obligation extends to all "material, favorable evidence in the government's possession").  Evidence that exists only in the mind of Murray, the prisoner-witness, or evidence which Murray failed to successfully communicate to the prosecution and to the police is not in any meaningful sense "possessed" by the prosecution. How could the prosecution turn over evidence that they do not know or do not understand? *Brady* did not establish a negligence regime whereby if the prosecutor or the police misunderstood

33

or misheard a drug-using prisoner's (subsequently withdrawn) statement, the habeas petitioner or criminal defendant walks. The purpose of *Brady* is to see to it that criminal trials are "fair," *Brady*, 373 U.S. at 87, that the prosecution does not obtain a conviction through active or passive "deception," *id.* at 86, not to subject the prosecution's investigation to any particular professional standard of care, negligence or otherwise, *cf. id*. at 87 (holding that *Brady* violation is not measured with respect to the prosecutor's "good faith or bad faith").

### D. Were Petitioner's Constitutional Rights Denied Because The Boyard Confession Was Not Heard By The Jury?

After the trial, petitioner sought a new trial based on purported after-discovered evidence. This evidence consisted of the affidavits of Robin Wright and Aaron Heiner. The Wright affidavit stated: "A couple of days after the killing of Anna Morris, Michael Boyard came to my house at [blacked out] in York, with a big stick. He asked me what he should do with it. I asked him why he needed to do anything with it and he responded he had beat somebody up with it." Wright Aff. (June 30, 1987). (Doc. No. 10 at Ex. 18.)[14]  Heiner was one of petitioner's trial witnesses. His affidavit stated: "On February 2, 1986, I encountered Michael Boyard on Market Street in York, carrying a stick. I

---

[14] Both affidavits spell the alleged murderer's name as "Boyard," but Petitioner's Opening Brief spells it as "Boylard." Petitioner's Opening Brief at 38 *et seq*. *But see* petitioner's Reply Brief at 13 n.13 (referring to "Bolyard").

inquired what he was doing with it and he said, 'This is what I killed the old lady with.' I told this to detectives Denny Smith and Castellano before the trial. I didn't tell this to Karl Chambers' lawyer until after the trial because *I forgot about it.*" Heiner Aff. (June 30, 1987). (Doc. No. 10 at Ex. 17.)[15] The trial court refused to grant a new trial. On appeal, petitioner argued both that the trial court erred, the trial court's error amounted to a violation of petitioner's constitutional rights, and that counsel was ineffective for failing to develop this evidence for use at trial. *See Chambers-1*, 599 A.2d at 642; Petitioner's Opening Brief at 38-42. *But see* Reply Brief at 12 (stating merely that this claim "arises out of the violation of Petitioner's federal constitutional right to effective assistance of counsel," but no longer asserting "court error").

The record in this more than twenty year old case is voluminous. It may

---

[15] In a third affidavit, the affidavit of Janel Trivelpiece, recording a July 20, 2006 interview, some twenty years after petitioner's 1986 conviction, Trivelpiece states: "Mr. Heiner ... stated [on July 20, 2006] that the axe handle that the Prosecution presented at trial had been taken from Mr. Chambers before the murder." Trivelpiece Aff. (undated). (Doc. No. 10 at Ex. 19). This factual claim was never before any state court, hence any legal claim for relief based on this nexus of facts was never exhausted in prior state court proceedings.

Furthermore, petitioner does not argue "actual innocence" based on the Trivelpiece affidavit. *See generally Herrera v. Collins*, 506 U.S. 390, 404 (1993) (Rehnquist, C.J.) (discussing requisite showing to establish "actual innocence" in order to present an otherwise procedurally barred constitutional claim); *Sistrunk v. Vaughn*, 96 F.3d 666, 675 (3d Cir. 1996) (noting that a habeas petitioner must either: (a) establish a violation of his constitutional rights in prior state court proceedings which was not otherwise procedurally barred; or (b) establish cause and prejudice for failing "to comply with the State's procedural rule"; or (c) "demonstrate that [petitioner] was innocent of the crimes for which he was convicted") (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (O'Connor, J.)).

be that petitioner's counsel is more intimately familiar with the details of this case than is the Court. But based on the briefing put forward by petitioner, the Court is simply at a loss to understand how petitioner's trial counsel was less than professional because he failed to identify Robin Wright before trial as a potential witness. There is *nothing* in petitioner's briefing explaining who Robin Wright is, how she was connected to the Morris investigation, or how any counsel – not otherwise omniscient – could have identified Wright as a potential witness prior to trial. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs hunting for truffles buried in briefs."); Petitioner's Opening Brief at 16 & n.12, 17, 38-42 (discussing Wright and Heiner affidavits); Reply Brief at 11-15 (same). Indeed, nothing in petitioner's briefing explains how trial counsel finally identified Wright for the purposes of post-trial briefing and the use of Wright's evidence in the related affidavits. Absent such a showing, trial counsel's "failure" to develop Wright's testimony and evidence for use during the initial trial cannot be conjured into an ineffective assistance of counsel claim. Moreover, on its face, there is nothing in the Wright affidavit connecting the facts described in the affidavit to the Morris murder (unless one assumes that only one person in and around York was violently beaten between the date Morris was murdered and the date Boyard visited Wright).

Heiner is situated no differently from Wright. Petitioner argues that trial counsel was charged with "know[ing] to ask all witnesses if they saw Bolyard

36

or knew anything about his conduct." Reply Brief at 13 n.13.   But petitioner has failed to explain how counsel should have known or could have known that Heiner was a "witness" in the first instance, or how counsel's questioning Heiner would have been revelatory given that Heiner had "forgot[ten] about" the  incident with Boyard until after the trial. Ex. 17.

In short, petitioner has failed to make the requisite showing of ineffective assistance of counsel.

### E.   Did The Prosecutor's Closing Argument Deprive Petitioner Of His Right To A Fair Trial?

Petitioner argues that the writ must be granted because, in violation of the petitioner's constitutional rights, "[t]he prosecutor [in his guilt phase closing statement to the jury] vouched for witnesses, introduced extra-record evidence, and misstated the law." Petitioner's Opening Brief at 43.  Although these three closely related claims for relief were made "through[] a full round of state postconviction proceedings" and were therefore "exhausted,"[16] petitioner failed to make these arguments at trial or on direct review.  As such they were waived under settled state law. *See* *Chambers-3*, 807 A.2d at 887

---

[16] 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 23.3b, at 968 (4th ed. 2001).  For substantiation of petitioner's exhausting this claim during PCRA proceedings see *Chambers-3, 807 A.2d at 887*; and Amended Petition for Habeas Corpus Relief Pursuant to Article I, Section14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief Under 42 Pa. C.S.  § 9542, et seq. and Consolidated Memorandum of Law § XI, at 66-74 (Apr. 20, 1998).

(finding waiver).[17]

Likewise, the State Supreme Court rejected this claim on the "merits". *Id.* However, the Court does not reach the merits because the conviction is fully supported by the adequate and independent state law grounds, *i.e.*, waiver. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (Blackmun, J.) ("By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law [as an alternative ground for the holding]."); *Sistrunk v. Vaughn*, 96 F.3d 666, 673-74 (3d Cir. 1996) (Stapleton, J.) (same) (citing *Harris, supra*); *United States* ex rel. *Abdus-Sabur v. Cuyler*, 653 F.2d 828 (3d Cir. 1981), *aff'g* 486

---

[17] The prosecution specifically raised waiver in its brief. *See* Responsive Brief at 20. Petitioner made no reply to the prosecution's argument. Reply Brief at 15. Furthermore, to the extent petitioner is making a separate ineffective assistance of counsel claim, based on the alleged ineffectiveness of trial and appellate counsel connected to the issues waived, petitioner's argument is rejected for the same reason petitioner's primary IAC Claim was rejected. *See generally supra* Section IV[A] (discussing petitioner's IAC Claim). Petitioner points to no PCRA testimony of trial or appellate counsel or other record evidence suggesting that the litigation strategy of counsel was ineffective. An ineffective assistance of counsel claim requires more than merely disagreeing with prior counsel's strategy after that strategy has failed. *See Sistrunk*, 96 F.3d at 675 (rejecting an ineffective assistance of counsel claim because "[c]ounsel's error cannot constitute cause for procedural default unless the error was also constitutionally ineffective under *Strickland*. Sistrunk *offers no proof* of cause and prejudice other than counsel's failure to preserve the issue on direct appeal.") (citation omitted) (emphasis added). The absence of proof or an offer of proof by petitioner, particularly where evidence from PCRA proceedings is expected, establishes that petitioner has failed to meet its burden under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See supra* Section IV[A][1] (discussing *Twombly, supra*).

F. Supp. 1141, 1162 & n. 31 (E.D. Pa. 1980) (Becker, J.) (noting "classic example of waiver [by defense counsel]" and that "under Pennsylvania law, contemporary-objection is required to preserve an issue for appeal"), *cert. denied*, 454 U.S. 1088 (1981).

### F.    Is Petitioner Entitled To Relief Because Of Cumulative Prejudicial Effect Of The Errors In This Case?

The Court has rejected each of petitioner's claims for individual error. As such, it finds that there was no cumulative error which prejudiced petitioner's fair trial or other constitutional rights. Although, "errors that individually do not warrant habeas relief may do so when combined," application of that rule requires at least two such errors to cumulate. *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (Cowen, J.). Here there are none.

## V.    CONCLUSION

On the basis of the foregoing, the parties' submissions, and the undisputed record, **IT IS RECOMMENDED THAT** the petitioner's amended petition for writ of habeas corpus be **DENIED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

Date: January 21, 2009

O:\shared\REPORTS\2006 Reports\06-0980-01.wpd